IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,

      VS.      CRIMINAL NO. 04-32

CARLOS AYALA MARRERO,

      DEFENDANT

_____

PROCEEDINGS

Transcript of HEARING ON SUPERVISED RELEASE VIOLATION,
commencing on WEDNESDAY, MAY 16, 2007, AT    11:00 A.M., in
the United States District Court, Second Floor, Erie,
Pennsylvania, before THE HONORABLE MAURICE B. COHILL, JUNIOR,
UNITED STATES SENIOR DISTRICT JUDGE FOR THE WESTERN DISTRICT
OF PENNSYLVANIA.


APPEARANCES:
For the Plaintiff:  By:  Marshall Piccinini, Esquire
                 Assistant U.S. Attorney
                 Office of the U.S. Attorney
                 Erie U.S. Courthouse
                 Erie, Pennsylvania

For the Defendant:  By:  Michael R. Hadley, Esquire

One Drake Drive
Oil City, Pennsylvania 16301


Reported by:        Sandra Wenger
                    Official Court Reporter
                    Fifth Floor, U.S. Courthouse
                    Pittsburgh, Pennsylvania 15219
                    412.261.6254


Proceedings recorded by mechanical stenography.   Transcript
produced by computer-aided transcription.

# I N D E X

- - -

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| D. CONDE | 3 | 10 | 15, 20 | 18 |
| C. MARRERO | 21 | 27 | 35 | -- |

- - -

3

1              P R O C E E D I N G S

2                    - - -

3        THE COURT:  Good morning.  Be seated, please.

4        MR. HADLEY:  Good morning, Your Honor.

5        MR. PICCININI:  Good morning, Your Honor.

6        THE COURT:  This is the time set for hearing with

7   respect to Carlos Ayala Marrero, charged with violation of his

8   supervised release.

9        Is Mr. Marrero contesting the charge of violations?

10        MR. HADLEY:  Your Honor, we just want the Court to

11   hear some context to this.  There is a lot behind the scenes

12   here that -- this is an unusual circumstance.  And, so, I

13   think we would like to hear from Mr. Conde as a witness.

14        THE COURT:  Okay.  Would you come forward, be sworn,

15   and spell your last name?

16        THE WITNESS:  David, middle initial J, Conde,

17   C-O-N-D-E.

18        DAVID J. CONDE, A WITNESS, having been first duly

19  sworn, was examined and testified as follows:

20                  - - -

21              DIRECT EXAMINATION

22  BY MR. PICCININI:

23  Q    Mr. Conde, how are you employed?

24  A    I am a United States Probation Officer, stationed at

25  Erie, Pennsylvania.

4

1  Q    Were you assigned to handle the supervised release of

2  Carlos Marrero?

3  A    Yes, sir.

4  Q    After the judgment in this case was entered and the

5  defendant was released from prison, did you -- did he report

6  to you, and did you get any sense, or did you obtain from him

7  his signature wherein he recognized and agreed to terms and

8  conditions of supervised release?

9  A    Yes, sir.

10  Q    I show you what I will refer to as Government Exhibit 1

11  for identification.  Can you identify this exhibit?

12  A    This is the judgment order entered by the Court in this

13  particular case.  On the back pages of the document you have

14  Mr. Marrero's signature, and also my signature, dated

15  September 27, 2005, in which it, basically, explains the

16  conditions read to him, that he fully understood the

17  conditions, and that he was provided a copy of the contents

18  for his own records.

19  Q    Okay.  Now, if you can go forward to the petition for

20  action here today.  First of all, with regard to the

21  defendant's violation concerning reporting to the Probation

22  Office and submitting a truthful and complete written report

23  within the first five days of the month.  Can you indicate to

24  Judge Cohill the extent to which Mr. Marrero failed to report

25  to the Probation Office?

5

1   A   Upon Mr. Marrero's release from the Renewal Center, he

2   was instructed by our office that he was to report on a weekly

3   basis.  In particular, he was to report on Thursdays.

4        The last time that he reported to our office was, in

5   person, was in December of 2006.  In particular, December 14

6   of 2006.  He would not report again to our office until

7   March 27 of 2007.

8   Q   And from December of 2006 until March of 2007, where was

9   the defendant?

10  A   I don't know.

11  Q   Did he come in for any reporting?

12  A   No.

13  Q   Did he come in for your analysis?

14  A   No.

15  Q   Did he come in for any verification as to what he was

16  doing during that time frame?

17  A   No.

18  Q   You have any indication that the defendant knew of his

19  obligation to report every Thursday?

20  A    Yes.  When he reported on the twenty-seventh of March, he

21  was asked, point blank, if he realized that he was required to

22  report weekly.  And he acknowledged that he knew he was

23  supposed to be reporting weekly.

24  Q    Well, in addition to his failures to report from December

25  through March, were there also conditions of his probation

6

1   that he maintain regular work, a lawful occupation, unless

2   excused, and that he notify you at least ten days prior to, to

3   any change of residence or employment?

4   A    That is correct.

5   Q    Can you indicate to Judge Cohill the extent to which

6   Mr. Marrero failed with regard to maintaining regular

7   employment and notifying you of any changes in employment?

8   A    Last information we had available to us was back in

9   December, at which time he was working for Better Bakes Food,

10   which is located in Northeast, Pennsylvania.

11      When he finally reported the end of March, he advised me

12   that he had not worked there for quite some time and that at

13   that point he had been working off and on with his father,

14   doing, basically, odd jobs.

15   Q    During this period when he just wasn't reporting, did you

16   take any steps to find him, find out where he was, or to check

17   what was supposed to be his approved residence to determine

18   whether he was around?

19   A    I made a couple home contacts at the girl friend's house,

20   which was, as far as we were concerned, the residence that he

21   was living at.  Left him a couple notes.  Eventually, the girl

22   friend came in, in person, to our office in mid-March asking

23   us to do something about Mr. Marrero because he was,

24   basically, according to her, back to his old ways of hanging

25   around with the people he shouldn't, drinking, not working.

7

1     So, I made arrangements to try to contact him via her

2   cell phone.  Several times, attempts were made to do that, but

3   each time we would call he was not around.  Eventually, he did

4   come in.

5   Q   Did you get some indication whether he was even living

6   there, staying there, at the approved residence?

7   A   According to the girl friend, she told me that there

8   would be days on end that he wouldn't be there.  At one point,

9   she said she had evicted him from the residence.  When she

10  came into the office back in March, she, herself, didn't

11  really know where he was staying whenever he wasn't at her

12  house.

13  Q   And the way she, she put it, he's back to his old ways?

14  A   Yes.

15  Q   Then, in addition, there are special conditions that the

16  defendant was aware of with regard to refraining from the use

17  of alcohol or controlled substances.  Can you indicate to

18  Judge Cohill to which Mr. Marrero failed in this regard?

19  A    On the March 7 report, we took a urinalysis test on him.

20  Prior to, to taking the test, we asked him, point blank, if he

21  had been using at all.  Meaning, any drugs or alcohol.  He

22  admitted to using drugs.  He also admitted to using alcohol.

23      The tests that we took on the twenty-seventh of March was

24  returned back positive for marijuana and cocaine.

25  Q    And did the defendant admit to you, in addition to the

8

1  test results coming back positive to the use of controlled

2  substances?

3  A   Yes.

4  Q   Were you aware, prior to taking on the supervision of the

5  defendant, of the Judge's concern about his drug use back when

6  he was originally sentenced in this case and with knowledge of

7  the circumstances of the burglary of this gun store that he

8  was charged with?

9  A   Yes.  There was concern for the simple reason of a lot of

10  the defendant's prior criminal record has and/or is drug or

11  alcohol involvement.

12  Q   What steps did you take, short of his revocation, to try

13  and help Mr. Marrero out with regard to that concern?

14  A   Initially, when he was released from the Bureau of

15  Prisons, he was referred to outpatient counsel.

16  Q   When was that?

17  A   That would have been September of '05.

18  A   During that time period, when he, when he got positive

19   drug tests for cocaine and marijuana, we then placed him in-

20   patient.  Eventually, we tried to place him in a partial

21   program at Crossroads.  He failed to attend the treatment.  We

22   continued to get positive urinalysis.

23      So, at that juncture, it was March of '06.  We asked for

24   a modification of judgment.  The Court signed that

25   modification and we sent Mr. Marrero down to Renewal, which is

9

1    the halfway house down in Pittsburgh, for participation in

2    what we call the sanctions programming.  While there, he

3    underwent individual outpatient counseling on-site and

4    completed that program upon discharge from Renewal.

5    Q    Was there a period of in-patient treatment prior to being

6    placed in Renewal?

7    A    Yes.

8    Q    And did the defendant fail in that regard, as well?

9    A    No.

10   Q    Did he make it through the in-patient program?

11   A    Yes, sir.

12   Q    When would he have gotten out of Renewal?

13   A    When he was discharged from Renewal, I do not recall,

14   exactly.  But it would have been August or September.

15   Q    After coming out of Renewal, was he then required to

16   report to you on those Thursdays?

17   A    Yes.

18   Q    And did he, at the beginning, occasionally report on

19  those Thursdays?

20  A   At the beginning, he reported, faithfully.

21  Q   And from August, just until December, and then come

22  December, he stopped reporting at all?

23  A   Yes.

24  Q   Till March of the next year?

25  A   Yes.

10

1   Q    And during the time frame of the defendant's supervision,

2   both prior to Renewal and then after going to Renewal, can you

3   indicate to the Court how many times this defendant, with the

4   exception of the time he was in the Renewal in-patient

5   treatment, tested positive for the use of drugs?

6   A    During the period of supervision, whole, it's been,

7   approximately, ten, eleven times.

8       MR. PICCININI:  That's all I have, Your Honor.

9        MR. HADLEY:  Thank you, Your Honor.

10                CROSS-EXAMINATION

11  BY MR. HADLEY:

12  Q    Good morning, Mr. Conde.  You prepared the presentence

13  investigation in this report in this case originally; correct.

14  A    Yes.

15  Q    The document, that page two of the judgment in the

16  criminal case, that Mr. Piccinini handed to you, would you

17  agree with me that it states that this Court makes the

18  following recommendations to the Bureau of Prisons, quote,

19  this young man has had a serious drug problem.  I recommend

20  that he be enrolled in the best drug rehabilitation program

21  available.

22      That's the Court's recommendation; correct?

23  A    To the Bureau of Prisons; yes.

24  Q    Isn't it true, while in the Bureau of Prisons, my client

25  received no drug treatment at all?

11

1  A    I can't answer that question.  I'm unfamiliar with the

2  Bureau of Prisons paperwork.

3  Q    The judge next commented, he has a girl friend, who is

4  supportive, and a child.  I would hope that he has matured

5  enough to become a constructive citizen.

6      Do you see that in the Judge's original notice?

7  A    Yes, sir.

8  Q    Sitting in the courtroom here is the girl friend, Janilla

9  Seeth (spelled phonetically).  You have met her?

10  A    Oh, yes.

11  Q    They have a four- or five-year-old child together;

12  correct?

13  A    Yes.  And she's expecting her second child.

14  Q    About six months pregnant with the second to Carlos;

15  correct?

16  A    Correct.

17  Q    Now, Janilla lives at -- in public housing, the City of

18  Erie's Housing Authority; correct?

19  A    That is correct.

20  Q    That is called the John E. Hornwargen Apartments;

21  correct?

22  A    Correct.

23  Q    And, in your experience, as a probation officer, I mean,

24  a family together is better than a family separated?

25  Generally, correct?

12

1   A    I don't disagree with that.

2   Q    In fact, the judge who originally commented about Janilla

3   (Spelled phonetically.) being supportive and the child.  But

4   isn't it true that Carlos, because of this conviction, isn't

5   allowed to make the public housing his official residence?

6   A    I would say yes and no on that.  There is a background to

7   that.

8   Q    Well, what's the background?  I mean, I want to know

9   because this is what concerns me.  You know, my guy, everybody

10  wants him to live with his girl friend and his children and

11  they're telling me with this conviction he can't make this --

12  his conditions?

13  A    That is correct.   He -- it cannot be his official

14  residence.  When he was released, I met with him and met with

15  her and, basically, told them that I don't -- it would be a

16  violation of the housing authority regulations that he live

17  there.  That if we know that there's a particular number of

18  days he can go and visit, but not to fool ourselves, and he

19    would pretty much by staying there.

20         That if there was any problems, we could always advise

21    the housing authority that he is residing there and she ends

22    up being evicted.  Mr. Marrero gave us an address, I believe,

23    on East 30th or East 31st Street that could be used, perhaps,

24    for managing purposes.  But, in reality, if we wanted to get

25    ahold of Mr. Marrero, we knew that's where we needed to go and

13

1  find him.

2     So, I would still consider that his residence because,

3  honestly, where is he staying?  Where is he sleeping?  Where

4  are the most of his clothes going to be?   It's going to be at

5  that residence.

6  Q    And I understand.  I agree with that.  He's going to try

7  to be there as much as he can.  But, officially, saying to the

8  housing authority, Carlos if he goes in, saying this is my

9  residence, she would be evicted?

10  A    Absolutely.  I don't disagree with that.

11  Q    The original presentence investigation indicated that

12  Carlos, his drug history, was more than just the use of

13  cocaine and marijuana; correct?

14  A    I did not look at the PSI this morning before coming to

15  Court, but I could probably recall that he probably has a

16  laundry list of different drugs he's use the in the past.

17  Q    He had a crack addiction.  Remember his admission to PSI

18  to crack and heroin?

19  A   Um-hum.

20  Q   Yes?

21  A   I don't recall the heroin, but it wouldn't surprise me.

22  Q   I'm -- towards the back is the treatment, drug and

23  alcohol.

24  A   Okay.

25  Q   To me, heroin, OxyContin, and crack are very serious

14

1  drugs?

2  A   Oh, I don't disagree with that at all.

3  Q   And at least at this point, the evidence is that Carlos

4  has not messed with those drugs since his release; correct?

5  A   Well, he hasn't messed with heroin and OxyContin.  I know

6  he has messed with cocaine.

7  Q   Powdered cocaine and alcohol use is what the test

8  reports; is that right?

9  A   Well, crack cocaine just comes back as a positive for

10  cocaine.  I can't say it was powder or crack.  I can't, I

11  can't state that.

12  Q    All right.  And there was -- were you aware, during the

13  period of time or that December to March, where Carlos was not

14  making contact, that there was a -- what I want to say -- him

15  and Janilla weren't getting along?  Fighting?

16  A   It would be impossible for me to know what was or

17  occurring during, during December through March, if I don't

18  have a person talking to me, calling me.

19  Q    Didn't you talk to Janilla?.

20  A    Not until the middle of March.

21  Q    Obviously, the things that aren't charged, for instance,

22  Carlos has not been charged with a new crime; correct?

23  A    Correct.

24  Q    There is no victims that we know of from any of his

25  conducts?

15

1  A   Not that I am aware of.

2  Q   Whatever program he was in, it doesn't seem like it got

3  the job done?

4  A   If he's still coming back positive in March of this year.

5  Q   What treatment programs are available to help this young

6  man with this serious drug problem?

7  A   My opinion, it's not the treatment program.  It's the

8  person.  It is the person.  If the person does not want to

9  change, you can send him to a thousand treatment programs and

10  it isn't going to make a difference.  It has to come from the

11  person.  So, to put the blame on a program, I don't think

12  would be a very fair assessment.

13  Q   Not every program.  Well, all right.  I'll argue that to

14  the Court.  You are going to hear from Carlos.  He'll address

15  those issues.

16    MR. HADLEY:  I have no further questions.

17            REDIRECT EXAMINATION

18  BY MR. PICCININI:

19  Q    Mr. Conde, in your petition on supervised release, did

20  you allege at all to Judge Cohill what one of the conditions

21  that he violated was his staying in any particular approved

22  residence?

23  A    No.

24  Q    So, the questions about whether he could stay in Housing

25  Authortiy property or stay somewhere else, you knew those

16

1   concerns and you didn't even allege that he violated the

2   condition because of where he was living?

3   A   No.

4   Q   With regard to where he was living.  Did that really

5   matter where he was living, as far as him having to show up

6   every Thursday?

7   A   No.

8   Q   Concerning the program that -- given the in-patient

9   treatment program that you sent Mr. Marrero to at the

10   beginning, as a courtesy to get him the help that he needed,

11   in your experience, was that, with that in-patient time, have

12   you seen people successfully complete the program?

13   A   My experience with treatment programs, as a whole, is

14   there are success stories.  There are failures.

15   Q   And with regard to the successes anad failures.  Are

16   those the product of the individual's willingness and maturity

17   to come to the point of fixing the problem that it is on with

18   the particular program?

19    A    It has to be on the individual; yes.

20    Q    The Renewal program that you sent him to, have you seen

21    success from the Renewal program?

22    A    Yes.

23    Q    That is why you chose the program that you did, because

24    you have a track history of feeling confident in the success

25    of the program?

17

1  A    Well, that and we were at crossroads where we had two

2  options available to us, make a motion to the Court for a show

3  cause hearing, potentially have him incarcerated, or send him

4  to a program, or, hopefully, we can change some behaviors on

5  attitudes, that he would make the right decisions, and we

6  wouldn't be in a decision that we find ourselves in this

7  morning.

8  Q    So, in the very beginning when this man was placed on

9  supervised release, and he was violating, tested positive, did

10  you, as a probation officer, have an option, even at that

11  point in time, of just saying this guy needs to go back to

12  jail and ask the judge to do so?

13  A    Yes.

14  Q    Then later, after giving him a break, he failed to show

15  when you sent him to Renewal.  Again, before going to Renewal,

16  did you have the option, in terms of to turn to the Judge,

17  saying, Judge, he violated conditions of your supervision.  He

18  should go to jail.  But, instead, you chose to send him to

19   Renewal?

20   A     Well, I didn't choose.  The Court chose to approve the

21   modification to send him to Renewal.

22   Q     You chose to recommend to the Court going to Renewal as

23   opposed to going jail?

24   A     Yes.

25   Q     Then only after failure at Renewal, and failure to show,

18

1    and the positive tests, did you seek action of this Court?

2    A    Correct.

3    Q    Now, the defendant also said that, you know, that he,

4    that his counsel indicates that he hasn't used these other

5    drugs.  But, Mr. Conde, can you indicate to the Court what

6    drugs this defendant used from December to March of '06, to

7    March of '07?

8    A    I can't.  He didn't report.

9    Q    So, you have no idea?

10   A    I have no idea.

11   Q    Could have done anything he wanted during this time

12   frame?

13   A    Hypothetically.

14   Q    Yes.  That's why you place people on supervision, so you

15   can supervise them?

16   A    Yes.

17        MR. PICCININI:  That's all I have, Your Honor.

18             RECROSS EXAMINATION

19  BY MR. HADLEY:

20  Q   Mr. Conde, I need to clarify my point about the family.

21  Isn't it true that in helping someone get over what Judge

22  Cohill called a serious drug problem, family support is a

23  positive in getting over a drug addiction?

24  A   Of course, it is.

25  Q   When you can't live with your girl friend and with your

19

1  child, doesn't that interfere with that family support?

2  A   If you are alluding to us --

3  Q   No.  To the rule that says he can't live --

4  A   I don't make the rules.

5  Q   I understand that.  But we're arguing that that had

6  something to do with he can't get a supportive family.  He

7  can't build his family.  Says he can't live in housing.  She

8  is indigent.  She has to take the public housing.

9      And it's no wonder, that's what I am trying to make the

10  point, I know you didn't revoke him because of that, but we

11  can't get them back together.  That's what I would think would

12  help them to be together.

13  A   Counselor, the only reason why they weren't together is

14  because they were having problems, not because of the housing

15  authority.

16  Q   You told us earlier, because of his conviction, he can't

17  make that his permanent residence?

18  A   That is a rule.  But he's been living there for quite

19  some time prior to that in the projects.

20  Q    You know, any time you are somewhere where you are not to

21  supposed to be, it's not the same as knowing you can be there.

22  There is some uncomfortability, knowing any day you can be

23  thrown out.  She can be evicted.  That's what we want to do,

24  get them in a family unit, together, so we can work on getting

25  in this program and beating this drug addiction.

20

1     MR. HADLEY:  So, thank you, Your Honor.  No further

2  cross.

3          THE COURT:  Thank you, Mr. Conde.

4          MR. PICCININI:  Your Honor, can I just?

5                  REDIRECT EXAMINATION

6  BY MR. PICCININI:

7  Q    When the defendant's girl friend came to you in March of

8  2007, did she complain at all about her concern that, if he

9  came to the house, that he would be evicted or that she would

10  be evicted?

11  A    No.  Her main point of concern was that he needed to

12  start doing the right thing to help support her, her present

13  child, and the child that she would be delivering in the near

14  future.

15  Q    Did she want him to stay there?

16  A    She didn't have a problem with him staying, as long as he

17  was doing what he was supposed to do.

18  Q    Housing Authority ever call you, call him, complain about

19  his presence there?

20  A    Never contacted me.  Whether or not they ever contacted

21  her, that I'm not aware.

22  Q    And you were familiar with the fact that she's pregnant,

23  now?

24  A    When she came to the office, I found out she was

25  pregnant; yes.

21

1  Q   Did -- is Mr. Marrero the father of that child?

2  A   As far as I know.  According to what she's told me.

3       MR. PICCININI:  That's all I have.

4       MR. HADLEY:  Nothing further, Your Honor.

5       THE COURT:  Thank you, Mr. Conde.

6       (Whereupon, the witness was excused from the witness

7  stand.)

8       THE COURT:  Is that it, as far as government's

9  evidence?

10      MR. PICCININI:  Yes, Your Honor.

11      THE COURT:  Mr. Hadley, do you have any testimony?

12      MR. HADLEY:  Yes.  I would call Carlos.

13      THE COURT:  Come forward and be sworn, please.

14      CARLOS AYALA MARRERO, DEFENDANT, having been first

15  dulyl sworn, was examined and testified as follows:

16      THE COURT:  Have a seat, please.  Give us your name,

17  spell your last name?

18      THE WITNESS:  Carlos Marrero.

19          DIRECT EXAMINATION

20   BY MR. HADLEY:

21   Q   Carlos, are you working, now?

22   A   Yes, I do.

23   Q   Where are you employed?

24   A   Well, right now, I work Conteen Temporary Agency.

25   Agency, temporary agency. (Spelled phonetically.)

22

1  Q    How long have you been working through this temp agency?

2  A    Well, I be working like with them for a week.  But before

3  that I was working with landscaping company.

4  Q    How long were you with the landscaping company?

5  A    Like for two months.

6  Q    What are the hours that you worked?

7  A    Landscaping?  Well, I was going from 6:30 in the morning,

8  like till, maybe like 9:00 p.m, 8:00 p.m. sometime.

9  Q    You have heard me ask Mr. Conde about you having a

10  serious drug problem; --

11  A    Yes.

12  Q    -- correct?  Would you admit that you had had a serious

13  drug problem?

14  A    Yes, I do.

15  Q    When you were serving the 18-month sentence that this

16  Judge imposed, what treatment did you get in the Bureau of

17  Prisons for your drug addiction?

18  A    None at all.  Nothing at all.

19  Q    Even though Judge Cohill recommended that you, quote, be

20  enrolled in the best drug rehab, you received no treatment in

21  the Bureau of Prisons?

22  A    Um-hum; yes.

23  Q    How long after your release was it until you got into any

24  sort of formal program?

25  A    Probably three, four months, something around there.  I

23

1  don't know.  I can't recall right now.

2  Q   As you sit here and testify today, do you want to beat

3  your drug addiction?

4  A   I always wanted to beat my drug addiction, but it's kind

5  of hard for me when I be like half of my life doing drugs and

6  stuff like that, you know.  And like right now, I be clean for

7  the past, you know, month or something like that, whatever.

8  But it's hard for me to do it.

9  Q   There was -- you had admitted in March to using some

10  drugs?  Of this year?

11  A   Yes, I did.

12  Q   Would you tell the Judge when, what, what the

13  circumstances in your life were surrounding your relapse into

14  drug use?

15  A   Well, was my family.  Because I was being around my son

16  and her, and me and her, we had disagreed.  And I had to go my

17  way for, you know, for a couple months until me and her fixed

18  it again.  That was one of the, the main made relapse on me,

19   caused me to relapse.

20   Q    Janilla Seeth (Spelled phonetically.) lives at the John

21   E. Horngarden Apartments; is that correct?

22   A    Yes.

23   Q    Now, can you make that your official residence?  Let the

24   Housing Authortiy know you are a resident there?

25   A    Well, I can't, I can't recall that.  But if it wouldn't

24

1  be for me, yes, I wouldn't -- I want to be there for her, my

2  son, and my and her kid that we, that we were expecting by

3  now.

4  Q    How many months?

5  A    She close to seven.

6  Q    Seven months.

7  Q    Do you want to reside with her and your children?

8  A    Sure; I do.

9  Q    Because of this problem with the Housing Authortiy rules,

10  what is your next residence that you can tell Judge Cohill you

11  are going to be residing at?

12  A    Well, I got a room right now rented.  It's right here on

13  Fifth, West Fifth. 514.

14  Q    Would 514 -- where is Fifth Street?

15  A    514 West Fifth Street.  Yes.

16  Q    Do you have to pay rent there?

17  A    Yes.

18  Q    Do you know how much the rent is?

19  A   Well, it's sixty dollars a week.

20  Q   There is, apparently, admittedly, a period of time when

21  you were not in regular contact with Mr. Conde; is that right?

22  A   Yes.

23  Q   Would you explain to Judge Cohill what was going on at

24  that time?

25  A   Well, I was really depressed about me and her being split

file:///A|/marrero%20.003.txt

25

1  like that.  And I didn't see my son for the whole period of

2  time.  And that's what, really, like that.

3  Q    Now, I mean, you are clearly aware of your obligations to

4  check in regularly with Mr. Conde; correct?

5  A   I always, I mean, -- yes.

6  Q    What assurances can you give Judge Cohill from this date

7  forward you will keep a regular schedule?

8  A    Well, like right now, for the past three months, I be

9  trying to get on my feet.  And I be trying to be with her and

10  my family.  And, now we want -- we're going to have my

11  daughter.  And whatever I got to do, I'll do it.

12  Q    How does your work schedule make it difficult to

13  sometimes keep meetings?

14  A    Well, when I was on the last landscaping company, it was

15  real difficult because I had to work from 6:30 in the morning

16  sometimes till like 9:00 p.m   Next day, we come again 5:30 in

17  the morning, to be at work at 6:30.  So, I had no chance at

18  all to go see him.

19     But he know that I always call him and let him know, you

20   know, or what was going on.  Like, hey, I can't make it

21   because of being there, you know what I mean?

22   Q   Just for some context here.  Are you paid by the hour?

23   A   Yes.

24   Q   What is your wage?  How much are you paid?

25   A   Well, when I was with the landscaping, they paid me six

file:///A|/marrero%20.003.txt

26

1  fifty.

2  Q    Six dollars fifty cents an hour?

3  A    Yes.

4  Q    And --

5  A    And that was one of the reason I stopped working with

6  them.  I move to the other job because now I'll be able to

7  work like from 6:30 to 4:00 in the afternoon.  So, I got a

8  chance to be with my family and do whatever I got to do with

9  my probation, whatever.

10  Q    Should Judge Cohill order today you be involved in in-

11  patient drug treatment or out-patient drug treatment, can you

12  tell Judge Cohill you'll comply with whatever drug treatment

13  he puts you in?

14  A    Yes, I do.  Whatever I got to do, that's what I have to

15  do.

16  Q    Should the Judge find that a house arrest type situation

17  would be appropriate, until you proved your drug commitment to

18  the program, could you be placed on house arrest at this 514

19   West Fifth Street?

20   A    Well, I still working and I still going to be able to see

21   my family and support them.  Like if I go to jail, I -- how am

22   I supposed to support my family?

23        MR. HADLEY:  Thank you, Carlos.  I don't have any other

24   questions.

25        THE COURT:   Thank you.

27

1       Mr. Piccinini, any questions?

2                    - - -

3           CROSS-EXAMINATION

4   BY MR. PICCININI:

5   Q    Mr. Marrero, you indicated to the Court that you're

6   currently working.  But isn't it true that you have only had

7   the current job that you have for a week?

8   A    This job; yes.

9   Q    This job you have now, you just had it for a week?

10   A    Um-hum.

11   Q    You claim to the Court that you have been working for the

12   landscaping company for two months?

13   A    Well, I was working before.  I was working Old Country

14   Buffet; right.  And then I went to landscaping.   But what I

15   mean is that I be working like for three months, period, all

16   these jobs.

17   Q    You said to the Judge, first, you said you have been

18   working, then when asked how long, you said a week, then you

19  said you were working for a landscaping company?

20  A   Um-hum.

21  Q   You claimed to the Judge you have been working there for

22  as long as two months.  That is not true.  You didn't work for

23  the landscaping company for two months --

24  A   Not for two months --

25      THE COURT:  Let him finish.  Go ahead.

28

1  A    What I was trying to say is that I be working for the

2  three-month period since March, the last when I went to see

3  him.  What I am trying to say is, I been working since that

4  day, March, like three months, up until now.

5  Q    Well, back in April, you were working temporarily at the

6  Old Country Buffet?

7  A    Yes.

8  Q    You were working third shift; is that true, as well?

9  A    Well, it wasn't all third shift.

10  Q    What was it?

11  A    They got different schedule.  One of the reason they make

12  me move from there is, was because I wanted to work daytime.

13  I been working like lunch time.

14  Q    So, you were working the night shift, which would have

15  made it very easy for you to report to Mr. Conde; wouldn't it

16  have?

17  A    Well, yes, but I take myself to school.  I have no ride.

18  I had to move all that.  Made it impossible to come down here.

19  Q    Now, the counsel asked you whether or not if you, if you

20  you currently recognize how important it is for you to report

21  regularly to your probation officer; correct?

22  A    Yes.

23  Q    Can you explain to Judge Cohill, when did you tell

24  Mr. Conde that you had moved to 514 West Fifth Street?

25  A    I never said I moved there.

29

1  Q    What did you say?

2  A    I said that I read the rules last night is when I rent

3  it.

4  Q    When did you rent it?

5  A    So why did you rent it, just so you can come in and tell

6  the Judge you had a room?

7  A    Not really.

8  Q    Or really?

9        MR. HADLEY:  Objection.  It's argumentative.

10        THE COURT:  Well, this is cross-examination.

11  A    Before all that.  Before that.  Before last time I was --

12  before last night, he knew that I was staying with my dad on

13  Third and Twelfth, Ash Street.  And I be staying there.  But

14  my dad want his privacy.  So, that's why I rent this other

15  room.

16  Q    It just happened that it's yesterday or last night, the

17  night before this hearing, that you come in and say you rented

18  a room at 514 West Fifth Street?

19  A    I don't know the coincidence or not.  But if you say it

20  like that, --.

21  Q    Why don't you tell Mr. Conde that you were planning on

22  moving to 514 West Fifth Street?

23  A    Well, I came couple times.  He wasn't there.  I wanted to

24  talk to him.  I came like two times before this hearing and he

25  wasn't even there.  So, I had to see somebody else down at the

30

1  probation office.  So, it wasn't possible for me to talk to

2  him about all this because he wasn't even there for the last

3  two times.  So, how am I supposed to talk to him if he ain't

4  there.

5  Q   Mr. Conde, regularly works here at the courthouse.  Did

6  you leave a note for him?

7  A   Well, no.  I wanted to talk to him personally.

8  Q   Did you leave a note for him?

9  A   No.

10  Q   How would he know that you were here to visit him if you

11  didn't leave a note for him?

12  A   Well, he know that I come on Thursday and Mondays.  If I

13  come on Monday, he ain't there, how I supposed to talk to him?

14  If I come on Thursday, how I supposed to talk to him if he

15  ain't there?

16  Q   Can you tell us who you were smoking cocaine or using

17  cocaine with?

18      MR. HADLEY:  Objection.  Relevance.

19          THE COURT:  That's relevant.  Go ahead.

20

21   BY MR. PICCININI:

22   Q     Who were you using cocaine with from December to March

23   of 2007?

24   A    I never said that I used cocaine all that three month

25   period.

file:///A|/marrero%20.003.txt

31

1   Q   Okay.

2   A   When I came to see him, he asked me.  I told him that I

3   relapsed because, before I came to see him, because I was a

4   little depressed and I smoked some.  I did some, smoked some

5   weed and I do some coke.  But that was only one time.  I

6   wasn't even doing it like that the whole three month period.

7   Q   You would agree with me, the buddies that, the people

8   that you know out on the street, they knew what happened to

9   you as far as you being convicted in this case?   They knew

10  you got a charge and that you got convicted; isn't that true?

11  A   I am sorry?

12  Q   Isn't it true that the people that you hang with knew

13  that you had been convicted in this case?

14  A   Well, I guess all my friends know about this; yes.

15  Q   Then we agree on that.  Wouldn't you also agree that your

16  friends knew that you were, on paper, that you had a PO and

17  that you you were, on paper, and that you were under

18  supervision?

19   A   Yes.  I guess.

20   Q   Now, can you explain to Judge Cohill who it was that you

21   were smoking dope with and who you were using cocaine with,

22   these folks who knew you were on federal supervised release?

23   Tell the Judge who you were smoking with, who you were using

24   cocaine with?

25   A   I never said I smoked dope.

32

1 Q    You smoked marijuana?

2 A    Marijuana; yes.

3 Q    Okay.  Tell the Judge?

4 A    I did it myself.

5 Q    Tell the Judge who you smoked marijuana with and who you

6 used, cocaine with while you were under this supervised

7 release that these folks knew you were on supervised release

8 for?

9 A    Like I said, again, I did it myself because I was

10 depressed.

11 Q    I am sorry.  I didn't ask you why you did it.

12       MR. HADLEY:  Objection.  He said --

13       THE COURT:  He said he smoked because he was

14 depressed.  Still hasn't answered the question.

15 BY MR. PICCININI:

16 Q    Who did you use cocaine and marijuana with during any

17 period of time under your supervision?

18 A    Myself.

19  Q   Just yourself.  Now, explain to the Judge, where did you

20  get the cocaine, marijuana from?

21  A   (No response.)

22  Q   You don't want to do that; do you?

23  A   (No response.)

24  Q   Mr. Marrero, when you got sentenced in this case,

25  Judge Cohill made some findings and comments about -- he

33

1   actually said that, I would hope that this man has matured

2   enough to become a constructive citizen.

3       Would you agree with me today that you are not even

4   willing to tell this federal judge who you got the cocaine

5   marijuana from that you were smoking?

6   A   You want me to say names.

7   Q   I want you say names.

8   A   I got friends.  They do drugs; yes.  You right.

9   Q   Those are friends that know you are on supervised

10  release?

11  A   Some of them.  Most of them told me, you know, they see

12  my name in the paper, whatever.  Some of them do, you know.

13  Q   I've asked you a direct question.  Do you understand the

14  question?

15  A   Yes.  I understand the question.

16  Q   Who distributed to you the marijuana and the cocaine that

17  you used while you were under this Court's federal supervised

18  release?

19  A    A friend.  A friend.

20  Q    What is the friend's name?

21  A    Nolan.

22  Q    Nolan.

23  A    Yes.

24  Q    That's a first name?  Last name?

25  A    That's his first name.

file:///A|/marrero%20.003.txt

34

1  Q   How long have you been hanging with Nolan.

2  A   Well, I haven't seen him like months.  That was like one

3  time,. that was like one time, like the one time that I

4  relapsed.  I see him and he was doing it.  So, I did it.

5  Q   What's his first name?

6  A   Nolan.

7  Q   I thought you said you did it by yourself.  You have to

8  tell the truth today.  A couple minutes ago, you said you did

9  it by yourself?

10  A   I don't see why it involve people.

11  Q   You may not want to involve people, but you have an

12  obligation.  You are sworn to tell the truth.  Your desire not

13  to dime out somebody else has nothing to do with that

14  obligation.

15     I asked you earlier who you used with.  You said you did

16  it by yourself.  You told the Judge directly, I did it by

17  myself, now?

18  A   Ain't nobody pushed me to do it.  I don't see why I got

19   to --

20   Q   Why you got to?  How about in order to be a constructive

21   citizen?  What is Nolan's first name?

22   A   Nolan.

23   Q   What is his last name?

24   A   I don't know.

25   Q   Where's he live?

35

1    A    I don't know.

2    Q    What is his phone number?

3    A    I don't know.  I haven't seen him in months.

4    Q    Who else did you use with?

5    A    Nobody else.  That was the one time that I relapsed.

6    That was when I came to see Conde and he got -- I told him,

7    obviously, I did.

8         MR. PICCININI:  I don't have anything further, Your

9    Honor.

10              REDIRECT EXAMINATION

11   BY MR. HADLEY:

12   Q    Carlos, you told us you didn't get any treatment while in

13   the Bureau of Prisons despite the Judge's suggestion for the

14   best program.  Give us some detail on what did happen at this

15   Renaisance program or Renewal program?

16   A    Well, pretty much it was go to work and pay half the

17   money.  That was all because -- they got no truth in

18   treatment.  We know more than what they do, because what I

file:///A|/marrero%20.003.txt

19   remember I tell my, my counselor, I told drug addiction is a

20   disease and he said he didn't know what I was talking about.

21          MR. HADLEY:  No further questions, Your Honor.

22          THE COURT:  You may step down.

23          MR. HADLEY:  If I could check with Carlos, but I

24   don't think we have any more testimony.

25          (Whereupon, an off-the-record discussion was had.)

36

1          MR. HADLEY:  Judge, we don't have any further

2   testimony.  Certainly, some argument.

3          (Whereupon, the witness was excused from the witness

4   stand.)

5          THE COURT:  Go ahead.  Make your argument.

6          MR. HADLEY:  Judge, this man has been let down from

7   what you envisioned when you sentenced him.  I mean, you wrote

8   out that he should get the best drug treatment program.

9          THE COURT:  He's been at two treatment programs

10  since then.  I mean, he's in prison for eighteen months,

11  whatever it was.  Probably less than eighteen, but the

12  sentence, I think, was eighteen.  And, really, most of those

13  drug programs, they call for longer, a longer sentence in

14  order to get the program, in the 500-hour program, that kind

15  of thing.

16          Certainly, I recommended it in the sentence, in the

17  sentencing memorandum, because this man needs, needs help.

18  But I don't think we can say that he has not been exposed to

19  treatment, because Mr. Conde referred him, sent him to two

20  treatment programs.

21      MR. HADLEY:  Well, but the only person who was in

22  that program was Carlos.  And as he told you, they did very

23  little other than take half his money and talk to him a little

24  bit.  And he, obviously, it hasn't worked.  We're not making

25  progress, not as a result of, I think, any lack of willfulness

37

1   from this young man, but the lack of, the root cause on this,

2   quite clearly, the cause of crime of being poor.

3        This man doesn't have what all of us would have if

4   we were on supervised release, the opportunity to live in our

5   homes or to live with our family.  To think of the hardship

6   that you cannot reunite with your girl friend and your family

7   because of this conviction, this is, to me, I think that this

8   Court whatever you do, should put in your order, if you could

9   do it whenever he is free again, to live with there, that any

10  rule of the Housing Authortiy is put aside and that they

11  should be able to live together as a family unit.

12       THE COURT:  There's been evidence that the Housing

13  Authority never imposed the rule on them.  The rule is there.

14  Obviously, there was no evidence to the Housing Authority,

15  hey, this guy's violating your rules.  There is no evidence

16  that the Housing Authority told him that he was, that he was

17  violating the rules.  He can stay there, presumably, if he was

18  well-behaved.

19          MR. HADLEY:  No.  Mr. Conde's testimony was, if he

20  was discovered, Janilla would be evicted.

21          THE COURT:  If they found out and enforced the rule.

22          MR. HADLEY:  Right.

23          THE COURT:  There is no evidence that they were --

24  knew or were enforcing the rule.

25          MR. HADLEY:  But that is not the same peace of mind

38

1   that comes from knowing they're affirmatively permitted to be

2   somewhere.

3       THE COURT:  Perhaps.

4       MR. HADLEY:  To start building a plan, a future, to

5   work together to build on.  This, this sword over your head

6   that could fall at any moment is not the kind of conducive

7   environment that would help any young man or any young person

8   rehabilitate themselves, as this Court knows he needs to do.

9   And everyone agrees he needs to do.

10      This thing, it's really just a tragedy.  We have not

11  seen a person have a fair shot at rehabilitation, at proving

12  himself.  These hurdles are, I mean, his employment, six

13  dollars and fifty cents an hour, with the obligations he has

14  to pay back and so forth.  But he is working.  He's going at

15  it.  He's stepped up.

16      He's admitted his relapse.  He's accepted that.

17  He's taken responsibility for it.  He is not committed to do

18  crimes.  He has not victimized people.  These things are, in

19   the grand scheme, they're wrong, but they are very minor.

20   They can be adjusted.  Sort of the consequence of

21   imprisonment.

22          You know, if we have to keep somebody in prison

23   until they get over their addiction, you may keep some addicts

24   in jail forever.  That's not what we are talking about.  We

25   are talking about someplace where he can substantially work,

file:///A|/marrero%20.003.txt

39

1  getting past this problem, uniting with his girl friend and

2  family, and becoming, as you said, a constructive citizen.

3       This has been a bump along the road.  This is not

4  good.  I am not here to argue any of this is good.  But in

5  comparison to what we could be revoking people for, where we

6  should be.  So, realistically, on this record, I can see you

7  wanting to hear my modifications, changes, et cetera.

8       What we are suggesting is, at worst, a house arrest

9  situation and, and, for sure, some kind of program.  Something

10  that's substantial.  The testimony was what he got wasn't

11  ample.  I take Carlos's testimony to be that let's get him in

12  something that's going to work.  Let's get him somewhere where

13  he can get past this.

14       If you have any ability to secure his permission to

15  live in the public housing, that should be part of the order,

16  as well.  We have got to fashion something so that he can be

17  there, secure in the knowledge that is where he's starting his

18  life, not about between his dad's house, a sixty dollars a

19   week house.  He needs to be with his girl friend, his

20   children, start anew.  There is room, short of incarceration,

21   to do that.  That's the just result here today.

22          These are, again, these are not new crimes.  He's

23   not victimizing people.  This is a problem that didn't get

24   addressed, for whatever circumstances.  I think there is room

25   for the Court to do what I suggest would, should be the

40

1  result.

2       MR. PICCININI:  Your Honor, you have in front of you

3  what the United States would characterize, I think, as a very

4  serious situation.  You have a man on federal supervised

5  release for having committed an offense where he and two

6  co-defendants busted into a gun dealership and stole a whole

7  slew of fire armaments.  You knew there were drug and alcohol

8  concerns at the time, as to how drunk, how much they were on

9  drugs at the time they committed that serious offense.

10       This whole claim about he didn't get what he was

11  supposed to as you ordered and the Bureau of Prisons is really

12  absent in the argument here today.

13       THE COURT:  Excuse me.  Well, it was not, just for

14  the record, it was not an order.  I can't order them to do it.

15  It was a recommendation.

16       MR. PICCININI:  Well, the argument from counsel is

17  that you -- they didn't do what you recommended.  But the

18  truth of the matter is, he didn't get designated until August

19  of 2005.  He didn't show up at the medical corrections center

20  in the New York federal facility in New York until August 10

21  of 2005.  And he only got an eighteen-month sentence and he

22  had been detailed.

23         So, he was only there less than thirty days, just

24  over thirty days.  He was released to supervised release.  It

25  wasn't because of anything the Bureau of Prisons did.  It

41

1  wasn't because of anything you failed to recommend.  It was

2  just because he had already served most of the eighteen

3  months.  He wasn't there for much more than a month and he was

4  on supervised release.

5        What that tells you, what that tells the Court, is

6  that even this period of total incarceration for eighteen

7  months wasn't enough to get this guy to tow the line.  You

8  made a comment, Judge, that you wondered, and you said, I

9  would hope that this man has matured enough to become a

10  constructive citizen.  And he has not.

11        Not because of anything, any fault on the Court, not

12  because of any fault on the probation officer, not because of

13  any fault in the rehab programs.  He's been federally

14  convicted, sentenced to eighteen months in prison, then

15  amended to supervised release.  That failed.

16        What do we hear today?  It's everybody else's fault.

17  Rehab wasn't good enough.  He didn't spend enough time in the

18  federal prison. Probation officer didn't check.  The Housing

19  Authority wouldn't let him stay there.  I find that to be

20  extremely dangerous to us if he is not treated appropriately

21  and harshly today, and he comes back out and he re-offends.

22          There is also another concern.  The guidelines, when

23  it comes down to it, they're all now just advisory.  But when

24  it comes to supervised release violations, the guidelines, at

25  all times, have only been advisory to the Court.

42

1          What the government's concerned about is you have a

2    young man that sat here on the witness stand, under oath, and

3    lied to you.  He wasn't more than five feet away from you.  He

4    lied to you.  You look at him.  Is he a man that is ready to

5    become a constructive citizen or is he a man so indoctrinated

6    in the drug and crime culture, that he is willing to, when

7    asked a direct question, is willing to tell the truth or is he

8    going to lie when it serves him better.

9          Night before a hearing on this matter, he's going to

10   rent an apartment so he can tell you that he, that he rented

11   one.

12          He's going to go out a week before this hearing, get

13   a job.  When he is asked the question, yes.  Unfortunately,

14   the next question is, how long have you had it?  A week.  Then

15   he is going to tell you he had a prior to job, just a few

16   months ago, but he can't explain what he said to you.

17          This guy lied to you just moments ago.  He committed

18   obstruction by doing so.  If we were in a regular sentencing

19   as opposed to a supervised release, I would be asking for a

20   upward departure.  I would ask for a sentence at the -- above

21   the guidelines that is mandatory.

22          He needs to leave here, even if I don't ask for an

23   upward departure from the guidelines, he needs to leave here

24   with an eleven-month sentence.  If he gets a year and a day,

25   he gets to, he gets to leave.  With an eleven-month sentence,

43

1    when he is done being on supervised release, hopefully, then

2    he'll be able to become a constructive citizen.

3        All this about he didn't have contact, she's

4    pregnant seven months ago by him.  During that time that he is

5    gone, he's never given one concern by the Housing Authority

6    that he couldn't stay there.  She wasn't worried about it.  He

7    wasn't worried about it.  And the testimony is just -- just

8    using it today was just another excuse.

9        That's all I have.

10       THE COURT:  Well, we're now ready to make findings

11   to this case.

12       We find that he has violated the following terms of

13   supervision.  He has failed to report to the probation officer

14   and submit truthful and complete written reports within a

15   prescribed basic month.  And he's not shown up once a week as

16   required.

17       He's not worked regularly at a lawful occupation,

18   and he wasn't excused by the probation officer for schooling,

19          training, or other acceptable reasons.

20                  He has not notified the probation officer at least

21          ten days prior to any change in residence or employment.

22                  He's not restrained from the use or possession and

23          purchase of drugs and alcohol.

24                  And that each of those, each of these violations is

25          a Grade C violation.  And the guideline, the advisory

44

1  Guidelines are as follows.

2       According to the revocation table in Section

3  7B1.4(a), a Grade C violation, and a criminal history category

4  of III, results in a recommended guideline imprisonment range

5  of five to eleven months.

6       Pursuant to Section 7B1.3(c)(1), where the minimum

7  term of imprisonment determined under Section 701.4 is at

8  least one month, but not more than six months, the minimum

9  term may be satisfied by a sentence of imprisonment or a

10  sentence of imprisonment which includes a term of supervised

11  release, with a condition that substitutes community

12  confinement, according to the schedule in Section 5C1.1(e)

13  for any portion of the minimum time.

14       Of course, as we know, these guidelines are

15  advisory.  And I am concerned about this young man.  I think

16  he needs -- we recently had another young defendant that was

17  -- admitted that he had strayed off track and supervision.  I

18  guess you have to break the same egg twice.  Well, I think

19    that may apply to Mr. Marrero, as well.

20        Under 18 United States Code, Section 3553, that the

21    statutory maximum term of imprisonment is twenty-four months.

22    If less than the statutory maximum is imposed, the Court may

23    require the defendant be placed on supervised release after

24    release from imprisonment.

25        Mr. Marrero, is there anything else you want to say?

45

1        THE DEFENDANT:  No.  I would like to say that I am

2   really sorry about all of this.  And that's all I can say.

3        THE COURT:  Is there any reason sentence should not

4   be imposed at this time?

5        THE DEFENDANT:  Excuse me?

6        THE COURT:  Is there any reason sentence should not

7   be imposed at this time?

8        MR. HADLEY:  If it please the Court, Judge.  We

9   don't object to a sentence imposed today.  If you decide

10  incarceration, we would ask for self-report, so he can get a

11  few things in order.

12       THE COURT:  All right.

13       MR. HADLEY:  No more than ten days, two weeks.

14       THE COURT:  Mr. Piccinini, is there any reason

15  sentence should not be imposed at this time?

16       MR. PICCININI:  No, Your Honor.

17       THE COURT:  Pursuant to the Sentencing Reform Act of

18  1984, it is the judgment of the Court that the term of

19    supervised release previously imposed is revoked, and the

20    defendant, Carlos Ayala Marrero, is hereby committed to the

21    custody of the Bureau of Prisons to be imprisoned for a term

22    of eleven months.

23          Upon release from imprisonment, the defendant shall

24    be placed on supervised release for a term of twenty-four

25    months.  All prior conditions of supervised release shall

46

1  continue in full force and effect.

2       We believe a term of eleven months' imprisonment,

3  followed by a term of twenty-four months' supervised release,

4  will adequately address the sentencing objectives of general

5  deterence, punishment, as well as the protection of the

6  community.

7       Mr. Marrero, you have a right to appeal.  You are

8  entitled to a lawyer at every stage of the proceeding.  If you

9  cannot afford an attorney, one will be provided for you

10  without charge.

11       And I am going to deny the request that there be a

12  delay.  We are directing Mr. Marrero be taken into custody at

13  this time.

14       Court's adjourned.

15       THE DEPUTY CLERK:  All rise.

16                    - - -

17       (Whereupon, the hearing was adjourned on the

18  sixteenth day of May, 2007.)

19                  - - -

20

21

22

23              C E R T I F I C A T E

24                  - - -

25          I certify by my original signature herein that the

forgoing is a correct transcript from the record of

proceedings in the above-entitled matter.


                            s/Sandra Wenger,
                            Official Court Reporter


*****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****